

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 26, 2023

**BY ECF**

The Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
Thurgood Marshall U.S. Courthouse
New York, New York 10007

    Re:    *United States v. Jerome Dimitriou*, S1 19 Cr. 894 (KPF)

Dear Judge Failla:

    The Government respectfully submits this letter in advance of sentencing of defendant Jerome Dimitriou (the "defendant"), which is scheduled for August 2, 2023 at 3:00 p.m. In November 2022, the defendant pleaded guilty to tax evasion pursuant to a plea agreement with the Government (the "Plea Agreement"). Under the Plea Agreement, the applicable range under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") is 6 to 12 months' imprisonment (the "Stipulated Guidelines Range"). The parties agree, however, that a two-level reduction in the offense level would be warranted under the proposed new Section 4C1.1 of the forthcoming November 2023 version of the Sentencing Guidelines, if it were in effect today. Accordingly, the parties agree that the defendant should be sentenced as though the applicable Guidelines range is 0 to 6 months' imprisonment. For the reasons set forth below, the Government respectfully submits that a sentence of **three months' imprisonment** is warranted in this case.

**A. Background and Offense Conduct**

    The defendant is an educated and experienced finance professional, with a lengthy career holding finance and management positions that paid him a significant salary. (*See* U.S. Probation Office's final Presentence Investigation Report dated February 15, 2023 (Dkt. 76 ("PSR"), ¶¶ 49, 51-53). From in or around 2000 until late 2017, the defendant was the Executive Director of the Greek Orthodox Archdiocese of America ("GOAA"), based at that organization's United States headquarters in New York, New York. (*Id.* ¶ 7). In that role, he managed the organization's operations and oversaw its finance team. (*Id.*). Prior to that role, the defendant served in several high-level finance roles, including as the head of the Finance and Accounting Department for GOAA, and as the Chief Financial Officer for a private sector venture involving Chase Manhattan Bank. (*Id.* ¶¶ 49, 51-53; *see also* Dkt. 81 ("Def. Mem."), pp. 12-13).

    From approximately 2011 through 2017, the defendant committed tax evasion. While serving as the Executive Director of GOAA, the defendant used a corporate credit card to pay for

at least approximately $63,692 worth of personal expenses for himself and his family (approximately $4,996 in 2011; $8,570 in 2012; $12,386 in 2013; $7,395 in 2014; $11,587 in 2015; $16,718 in 2016; and $2,020 in 2017). (*Id.* ¶ 8). In total, the defendant charged more than 250 personal purchases to the corporate credit card. His personal expenditures ranged from transportation and travel to jewelry to a gym membership to personal grooming products to retail charges. (*Id.*). The defendant charged these purchases to GOAA, which paid them. (*Id.* ¶ 9).

The income from the defendant's personal credit card charges was in addition to his substantial salary payments from GOAA, which ranged from approximately $396,000 to $450,000 per year from 2013 through 2017. (*Id.* ¶ 10). Despite his lengthy career in finance, his substantial earnings, and his considerable net worth (*see* PSR ¶ 55), the defendant did not file individual tax returns with the IRS for seven consecutive years—2011 through 2017. (*Id.* ¶ 11). During that seven-year period, he did not pay taxes on the $63,692 worth of personal expenses that he had charged to GOAA; these taxes totaled approximately $17,833.72. (*Id.* ¶ 12).[1]

## B. Procedural History

On November 25, 2019, the defendant was arrested and charged by complaint (the "Complaint") with two counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. (Dkt. 1). On the same date, the defendant was presented and ordered released on bail. (Dkt. 4). On December 12, 2019, a grand jury in this District returned an indictment (the "Indictment") containing the same two counts set forth in the Complaint. (Dkt. 7).

On November 7, 2022, the defendant waived Indictment and pleaded guilty to a one-count Superseding Information charging him with evasion of tax assessment for calendar year 2016, in violation of 26 U.S.C. § 7201. (Dkt. 67-68).

On February 15, 2023, the U.S. Probation Office ("Probation") filed the final PSR and recommended a sentence of two years' probation. (PSR pp. 18–19).[2] On July 19, 2023, the

---

[1] Based on Forms W-2 issued by GOAA, the IRS prepared Substitute Form Returns ("SFRs") for the defendant for five of the seven years at issue (2011, 2012, 2013, 2014, and 2016). The IRS files SFRs for delinquent taxpayers based on information available to the IRS from third parties, such as Forms W-2 or 1099s. Before the IRS files an SFR, the IRS sends notices to the delinquent taxpayer, as it did here. Specifically, the IRS's internal database reveals that the IRS sent a statutory notice of deficiency to the defendant, for each of these five SFR years. The IRS sent these notices to the defendant's home address (*i.e.*, the address noted in the PSR, *see* p. 3). The IRS's internal database also reveals that the IRS sent another notice to the defendant during each of these five years—a subsequent Final Notice of Lien—which the IRS likewise sent to his home address. The IRS sent this subsequent notice due to the defendant's non-response and continued non-payment. Thus, in total, the IRS sent at least approximately ten notices, across those five SFR years, to the defendant—yet he still did not file tax returns.

[2] Paragraph 51 of the PSR states, in part, that: "The defendant reported that he left the job [as Executive Director of GOAA] due to a contractual dispute." (PSR ¶ 51). The Government has conferred with counsel for GOAA, which had a different explanation for the defendant's

defense filed its sentencing memorandum, seeking a sentence in accord with that recommended by Probation. (Def. Mem. 1, 22).

## C. Applicable Law

As the Court is well aware, although the Sentencing Guidelines are no longer mandatory, they provide strong guidance to courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. The Guidelines' relevance stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007). After making that calculation, the Court must consider the seven factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to deter criminal conduct, and the need to promote respect for the law. *Gall*, 552 U.S. at 50 & n.6. If the judge "decides that an outside-Guidelines sentence is warranted, [s]he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 50.

## D. Discussion

Based on the factors set forth in 18 U.S.C. § 3553(a), a custodial sentence of three months' imprisonment is appropriate in this case. Such a sentence is warranted in light of the seriousness of the offense, the deceptiveness of the offense, the duration of the offense, the harmfulness of tax fraud, the need for general deterrence, and the defendant's personal characteristics—such as his education, experience, expertise, talent, and financial comfort—which rendered him exceptionally well-situated to meet the core legal obligation to file annual tax returns and pay taxes. Instead, for seven years, the defendant elected not to file any tax returns at all, including his choice to evade taxes on his supplemental income.

### 1. Nature, Circumstances, and Seriousness of the Offense, Need to Promote Respect for the Law, and Need to Provide Just Punishment

As to the nature and circumstances of the offense, this was a serious crime that warrants a commensurate punishment. While he was the Executive Director of GOAA, the defendant charged at least approximately $63,692 worth of personal expenses to a corporate credit card; his charges ranged from transportation and travel to jewelry to personal grooming products to gym

---

separation from GOAA: In or around late 2016 or early 2017, new leadership came in, and one of their initiatives was to upgrade GOAA's controls and hire a CFO. The defendant resisted hiring a CFO. Ultimately, after a CFO was appointed, the defendant obstructed the CFO's access to information and key personnel. Once the CFO did access such information, the CFO discovered mismanagement. From GOAA's perspective, this series of events (rather than a contractual dispute) prompted GOAA's separation from the defendant.

membership to retail charges. (PSR ¶ 8). His relevant purchases were obviously personal in nature, including (among various other examples) men's and women's watches; a gym membership; and travel expenses (*e.g.*, flight tickets and hotels) for trips with his wife and/or family, including trips to Aruba and to Marco Island. (*Id.*). Although the defendant charged these purchases to his employer, he neither reported this supplemental income to the IRS nor paid taxes on it. Indeed, for seven years in a row, the defendant did not file tax returns with the IRS at all. His refusal to file tax returns was unusually persistent: During these seven years, the IRS sent the defendant at least approximately ten notices (*e.g.*, a statutory notice of deficiency), yet he still did not file tax returns.

The seriousness of the defendant's misconduct is apparent from, among other things, the combination of four undisputed facts:

1. The defendant committed tax evasion for seven years.

2. The defendant failed to file tax returns for seven consecutive years, 2011 through 2017.

3. The defendant committed this felony tax offense despite being an executive who was compensated handsomely. He received more than $300,000 in salary payments every one of those seven years, and more than $400,000 for several of those years.

4. The defendant is well-educated, had extensive professional experience, and had served in various high-level finance roles, including as the head of the Finance and Accounting Department for GOAA, and as the Chief Financial Officer for a private sector venture involving Chase Manhattan Bank.

A custodial sentence is warranted for a high-level executive, with extensive financial expertise, who receives quite generous compensation but deliberately shirks his obligations to the IRS, year after year. Most Americans do not enjoy prestigious leadership roles; do not charge trips or jewelry to a corporate credit card; do not own a five-bedroom, five-bathroom home (*see* PSR ¶¶ 44, 55); yet manage to file their tax returns. Indeed, the defendant had advantages that most people can only dream about—he enjoyed financial stability and comfort as a well-educated, talented, and successful executive. He was, in short, unusually well-situated to comply with his legal obligations—but he chose otherwise, year after year. Those choices have consequences.

One reason those choices matter is because of the importance of taxes to a functioning democracy. The Supreme Court has long recognized that "[t]he United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received." *Spies v. United States*, 317 U.S. 492, 495 (1943). A functioning government relies on its citizens and residents to report timely, completely, and honestly all taxes they owe, which is why Congress has made it a criminal offense to file false returns, fail to file tax returns, or evade income taxes. Indeed, as the Second Circuit has recognized, "tax crimes represent an especially damaging category of criminal offenses," which "strike at the foundation of functioning government."

*United States v. Zukerman*, 897 F.3d 423, 427 (2d Cir. 2018); *see generally Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) ("Taxes are what we pay for a civilized society. . . .") (Holmes, J., dissenting). In sum, every tax fraud costs the United States Treasury and the public.

A custodial sentence is also necessary to promote respect for law and to provide just punishment. By definition, the conduct here—evading taxes and refusing to file tax returns year after year—involves a fundamental lack of respect for the law, which requires individuals and businesses to accurately report their income and pay taxes on that income.

### 2. The Need to Afford Adequate Deterrence

The sentence sought by the Government is also necessary here to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). General deterrence is particularly important in cases like this because it is essential to reducing the ever-increasing amount of money lost each year through tax fraud. A 2016 IRS study of tax compliance estimated that only 85% of individuals are compliant with their tax obligations, leaving a yearly tax gap of approximately $496 billion dollars in unreported and uncollected taxes.[3] As of 2021, the IRS Commissioner estimated that the U.S. Treasury loses approximately $1 trillion in unpaid taxes per year.[4] These are astonishing figures; they underscore the frequency of tax evasion, and the difficulty in detecting and prosecuting this crime. "The sheer magnitude of lost [tax] revenue is striking: it is equal to 3 percent of GDP, or all the income taxes paid by the lowest earning 90 percent of taxpayers." Natasha Sarin, Deputy Assistant Secretary for Economic Policy, U.S. Dept. of Treasury, *The Case for a Robust Attack on the Tax Gap*, Sept. 7, 2021, *available at* https://home.treasury.gov/news/featured-stories/the-case-for-a-robust-attack-on-the-tax-gap. Thus, contrary to the defense's argument that the fact of this conviction "sends a powerful message about the seriousness of such conduct" (Def. Mem. 20), widespread noncompliance with the Internal Revenue Code is an ongoing problem that merits the Court's strong consideration when imposing sentence.

Indeed, the importance of affording general deterrence through meaningful sentences is particularly acute in criminal tax cases. As a result of the significant resources required to mount a criminal tax prosecution, such prosecutions are relatively rare. As the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations,

---

[3] *See* "Tax Gap Estimates for Tax Years 2014-2016," April 2016, *available at* https://www.irs.gov/newsroom/the-tax-gap (last visited July 26, 2023, as were all websites cited in this letter).

[4] *See* Alan Rappeport, *Tax cheats cost the U.S. $1 trillion per year, I.R.S. chief says*, April 13, 2021, *available at* https://www.nytimes.com/2021/04/13/business/irs-tax-gap.html.

>  deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. ch. 2, pt. T, introductory cmt. Where the incidence of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence. *See, e.g.*, Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 Emory L.J. 265, 321 (2011) ("Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect."); *see also, e.g.*, *United States v. Zukerman*, 897 F.3d at 429 (general deterrence "has a particularly important role" due "to the significant resources required to monitor and prosecute tax crimes," which "cost the government hundreds of billions of dollars annually"; quoting and finding "eminently reasonable" district court's findings with respect to deterrence); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."). Thus, in order to provide adequate general deterrence, sentences for multi-year tax frauds must be substantial.

These principles are directly relevant here, for opportunities abound for executives to commit this type of crime—evading taxes on supplemental income or corporate perks. It is therefore especially important to send a clear message about the seriousness of this type of conduct.

In sum, this country depends largely upon voluntary compliance with the internal revenue laws by all citizens, regardless of wealth, status, or position. That system of voluntary compliance would crumble if those owing taxes believed they could cheat with impunity or that the sanction that they would face when caught would not be significant. Accordingly, general deterrence in cases like this is important—indeed, essential—to the orderly and fair administration of our nation's tax law system.

### 3. The Defense's Arguments

In seeking a sentence of probation, the defense highlights, among other things, the defendant's impressive family; his dedication to his friends; and his volunteer work while on pretrial release. These arguments are legitimate and mitigating. He deserves credit for the good he has done.

However, the defense also relies on certain other arguments, which are unpersuasive and should not affect the sentencing calculus. *First*, the defense cites the things the defendant has lost due to his felony conviction, such as his livelihood and standing in the Greek Orthodox community. To the extent the defendant contends that his loss of social, reputational, or professional standing as a result of his conviction warrant a lighter sentence (*see* Def. Mem. 19), the Second Circuit has rejected this reasoning. In *United States v. Cutler*, 520 F.3d 136 (2d Cir. 2008), the district court

> ruled that although the seriousness of [defendant's] offense would ordinarily warrant a prison term, [defendant] had already received "just punishment for the offense" because of "the public nature of the prosecution, the public humiliation that the defendant has suffered, the loss of his law license and various other consequences, and the certainty of prosecution." The court also found that these factors were sufficient to accomplish "deterrence in the general sense."

520 F.3d at 170 (citations to sentencing transcript omitted). The Second Circuit's response was clear: "As a matter of law and reason, we cannot agree." *Id.* The Circuit then noted that "the consequences listed by the court are hardly unusual. An attorney convicted of a felony usually loses his license to practice law. The imposition of a light sentence on this basis is not within the court's discretion." *Id.* (citing *Koon v. United States*, 518 U.S. 81, 110 (1996)). The Circuit also wrote:

> [T]he circumstances referred to by the district court do not constitute punishment. The public nature of criminal prosecutions is part of our constitutional fabric; the public humiliation suffered by one prosecuted and convicted of a crime is an ordinary consequence of his conduct, not a condition imposed by the criminal codes or the judicial process. These circumstances, though adverse, are not what § 3553(a)(2)(A) means by "punishment." Hence they cannot properly be viewed as fulfilling the need for the imposition of just punishment.

*Id.* at 171.[5]

*Second*, the defense contends that the Guidelines and United States Code support probationary sentences for first-time offenders convicted of an offense that is neither violent nor "an otherwise serious offense." (Def. Mem. 18 (citing 28 U.S.C. § 994(j)). Yet on the very next page of its letter, the defense acknowledges that "depriving the Treasury Department of revenue is a *serious offense*." (Def. Mem. 19) (emphasis added). This acknowledgement completely— and correctly—undercuts the notion that felony tax evasion is a non-serious offense (and thus one that merits probation under these authorities).

*Third*, the defense contends that a probationary sentence would promote general deterrence, arguing that it is the likelihood of being caught, rather than the length of the sentence, that has "the strongest deterrent effect." (Def. Mem. 20). The defense also suggests that longer sentences do not achieve greater deterrence. (*Id.* at 20-21). But deterrence does not have merely one component. Detection, prosecution, arrest, and a just sentence are all essential to achieving

---

[5] *See also*, *e.g.*, *United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) ("In imposing a sentence of one day with credit for the day of processing, the district court relied heavily on the fact that Musgrave had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life. '[N]one of these things are [his] sentence. Nor are they consequences of his sentence'; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." (citation omitted)).

deterrence. Whether a wrongdoer gets prosecuted at all is obviously relevant—but so is whether he is punished to community service or prison. Moreover, the defense's focus on the length of the sentence overlooks the critical question of the nature of the sentence; whether a criminal can expect to go home, or to be sentenced to prison, is (obviously) enormously significant to general deterrence. As one judge stated, "I found that to a person, [executives accused of white-collar crimes] feared prison, and they feared it mightily. They would have paid any amount of money, done anything to avoid going to prison. So prison does have a major deterrent effect."[6]

To be sure, some critics question the efficacy of general deterrence, because general deterrence presumes a "rational" actor—an individual able to weigh the costs and benefits of crime. Critics may reason that an individual suffering from drug addiction, for instance, may not be able to conduct this cost-benefit analysis. But typical white-collar criminals—like the defendant—certainly can. They have various advantages that make them particularly well-suited to conduct a cost-benefit analysis before committing crime. For instance, white-collar defendants are much more likely to know what happened in other criminal cases, given their access to technology and information, their attendance at industry conferences, and their access to informed advisors, such as lawyers and accountants. Thus, if anything, general deterrence is quite likely to have more of an impact in white-collar cases.

In sum, the defense's general deterrence argument is not only wrong, but also poorly suited to this type of crime, which is (1) easy to commit; (2) hard to detect; (3) profitable; (4) calculated; (5) deceptive; (6) common; (7) harmful; and (8) especially well-suited to a cost-benefit analysis.[7]

---

[6] Bill Snyder, *How to Stop White-Collar Crime: A federal judge says fear of prison is the best way to deter bad behavior*, Stanford Graduate School of Business, July 25, 2017, *available at* https://www.gsb.stanford.edu/insights/how-stop-white-collar-crime (quoting Judge Rakoff).

[7] To the extent that the defense seeks lenience on account of the defendant's purported successes leading GOAA, *see, e.g.*, Def. Mem. 13-14 ("Without Jerry's leadership, the GOA experienced severe administrative difficulties, and ultimately brought him back by offering an enhanced compensation package . . . . Under Jerry's stewardship, the GOA once again thrived."), this investigation has revealed a different portrait than the defense's portrayal. For instance, as noted above, when GOAA sought to hire a CFO and improve its internal controls in or around late 2016 or early 2017, the defendant obstructed those efforts. Eventually, it became clear that, under the defendant's leadership, GOAA had an operating deficit, financial mismanagement, and a need for stronger internal controls. To be clear, the Government is not suggesting that all of an organization's difficulties are the responsibility of one person, but rather, that the sharp contrast alleged by the defense (*i.e.*, severe difficulties without him vs. thriving "under [his] stewardship") is not supported by our investigation.

Hon. Katherine Polk Failla  Page 9
United States District Judge

### E. Conclusion

      For the reasons set forth above, the Government respectfully requests that the Court impose a custodial sentence of three months.

      Respectfully submitted,

      DAMIAN WILLIAMS
      United States Attorney for the
      Southern District of New York

By:           /s/
      Michael D. Neff / Timothy V. Capozzi
      Assistant United States Attorneys
      (212) 637-2107/-2404

cc: Nathaniel Z. Marmur, Esq. (all via ECF)
    David M. Siegal, Esq.
    Erin E. Galliher, Esq.
    Greer Clem, Esq.